**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ECM ASSOCIATED, LLC, and )
WERNER ENTERPRISES, INC., )
) 2:24-cv-1698-RJC
Plaintiffs, )
)
v. )
)
EDWARD C. MEIER, PHYLLIS )
MEIER, EDWARD C. MEIER JR., )
COURTNEY MEIER, ALEXIS MEIER, )
DANIELLE VARDIS, ECO )
INDUSTRIES, INC., BLACK HORSE )
FLEET HOLDING LLC, CORR )
LOGISTICS & WAREHOUSING, LLC, )
VENTURE HOLDINGS GROUP LLC, )
INTERSTATE TRANSPORT LLC, and )
PC&A LOGISTICS & WAREHOUSING )
LLC, )
)
Defendants. )

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

Before the Court is a Motion for Temporary Restraining Order and Preliminary Injunction ("PI Motion")[1] (ECF No. 4) filed by Plaintiffs ECM Associated, LLC ("ECM") and Werner Enterprises Inc. ("Werner") (collectively, "Plaintiffs") in this matter. The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. Plaintiffs' Motion has been fully briefed and is ripe for disposition.

---

[1] Because Defendants have been served and have appeared in this matter, and because the legal standard that applies to temporary restraining orders is the same that applies to preliminary injunctions, the Court considers the request for a temporary restraining order to be moot and will consider only Plaintiffs' request for a preliminary injunction herein.

1

## I.    Procedural History and Factual Background

On December 16, 2024, Plaintiffs filed their original complaint, naming Edward C. Meier, Phyllis Meier, Edward C. Meier Jr., Courtney Meier, Alexis Meier, Danielle Vardis, ECO Industries, Inc. ("ECO"), and Fictious Entity XYZ as Defendants.[2]  On the same date, Plaintiffs filed the PI Motion along with a Brief in Support (ECF No. 5), a Declaration in Support (ECF No. 14), a Motion to Expedite Discovery (ECF No. 6), and a Motion for Preservation of Evidence (ECF No. 7).  The next day, the Court entered a scheduling order (ECF No. 15).  The Order scheduled a hearing for January 14, 2025, set forth several aggressive filing and discovery deadlines, and dismissed Plaintiffs' Motion to Expedite Discovery and Motion for Preservation of Evidence as moot given the requirements set forth in the scheduling Order.  The parties subsequently filed two joint motions to continue the hearing and certain of the deadlines, and the hearing ("PI Hearing") was eventually held on February 27, 2025.

On January 10, 2025, Plaintiffs filed the operative First Amended Complaint (the "Complaint") (ECF No. 39), which set forth claims against the original Defendants and the following additional entities: Black Horse Fleet Holding LLC ("Black Horse"), Corr Logistics & Warehousing, LLC ("Corr"), Venture Holdings Group LLC ("Venture"), Interstate Transport LLC ("Interstate"), and PC&A Logistics & Warehousing LLC ("PC&A").  In the Complaint, Plaintiff asserts the following claims: (1) Count I – a claim for Violation of the Defend Trade Secrets Act against all Defendants; (2) Count II – a claim for Misappropriation of Trade Secrets Under the Pennsylvania Uniform Trade Secrets Act against all Defendants; (3) Count III – a claim for Unfair Competition Under 15 U.S.C. § 1125(a) against all Defendants; (4) Count IV – a claim for Unfair

---

[2] For the sake of simplicity and in the interest of not being overly verbose, the Court will refer to the individual Defendants by their first names at junctures throughout this Memorandum Opinion.  In doing so, the Court will refer to Edward C. Meier as "Edward Sr." and Edward C. Meier Jr. as "Edward Jr."  Edward Sr. and Phyllis Meier are married, and Defendants Edward Jr., Courtney, and Alexis are their children.

Competition Under Pennsylvania Law against all Defendants; (5) Count V – a claim for Breach of Contract, specifically an Employment Agreement, against Edward Meier Sr.; (6) Count VI – a claim for Breach of Contract, specifically a Third Restated LLC Agreement, against Edward Meier Sr. and ECO; (7) Count VII – a claim for Tortious Interference with Business Relations against all Defendants; (8) Count VIII – a claim for Conspiracy against all Defendants; (9) Count IX a claim for Fraudulent Misrepresentation against all Defendants; (10) Count X – a claim for Abuse of Process against Edward Meier Sr. and ECO; (11) Count XI – a claim for Unjust Enrichment against all Defendants; (12) XII – a claim for Breach of Fiduciary Duty against all Defendants; (13) a claim for Breach of Contract against Phyllis Meier.  By way of the Amended Complaint, Plaintiffs seek monetary and equitable relief.

As noted, Defendants have filed an Amended Answer to the Amended Complaint, and certain Defendants have filed a Counterclaim.  On February 21, 2025, Plaintiffs filed the affidavit (ECF No. 52)[3] that constituted their presentation of direct testimony for purposes of the PI Hearing. Defendants filed their direct testimony affidavits (ECF Nos. 54 through 57) on February 24, 2025, and their Brief in Opposition (ECF No. 58) to the PI Motion on February 25, 2025.[4]

As noted, the PI Hearing took place on February 27, 2025. Consistent with the Court's Order at ECF No. 15, the parties submitted all direct testimony by way of the affidavits discussed above.  During the PI Hearing, Plaintiffs first called Edward Meier, Sr. for cross-examination, and

---

[3] Following the PI Hearing, Plaintiffs filed an edited version of this Affidavit via an "errata" entry on the docket at ECF No. 68 (the "Errata Affidavit").  Defendants move to strike the Errata Affidavit, as well as Paragraphs 3, 5 through 20, and 24 of the Affidavit of Nathan Meisgeier (ECF No. 69) ("Meisgeier Affidavit"), via a Motion filed at ECF No. 70 ("Defendants' Motion to Strike").  Plaintiffs filed a Brief in Opposition (ECF No. 73) to Defendants' Motion to Strike on March 21, 2025, and Defendants filed a Reply (ECF No. 74) on March 25, 2025.  The Court will address Defendants' Motion to Strike below.

[4] A Motion to Strike (ECF No. 59) the Brief in Opposition and a Motion to Strike (ECF No. 63) a Surreply (ECF No. 62) to that Motion to Strike were subsequently filed by Plaintiff.  The Court denied those Motions to Strike in open court during the PI Hearing.

Defendants then elicited rebuttal testimony.  Plaintiffs next called Phyllis Meier for cross-examination, with Defendants again eliciting rebuttal testimony.  Defendants then called Angelo Gibson for cross-examination, and Plaintiffs elicited rebuttal testimony with respect to this witness.  Prior to the conclusion of the PI Hearing, Plaintiffs' Exhibits 1-139 and Defendants' Exhibits 1-11 were admitted into evidence by the Court.

Following the PI Hearing, the Court ordered Defendants to file a standalone second amended answer, and the operative Second Amended Answer and Counterclaim (the "Answer") (ECF No. 71) was filed on March 12, 2025.[5]  The Court further directed the parties to request the preparation of the transcript of the PI Hearing, and further ordered the submission of supplemental briefing.  The Transcript (ECF No. 72) was filed on March 12, 2025.  The parties filed their Supplemental Briefs (ECF Nos. 80 and 81) in opposition to and support of, respectively, Plaintiffs' request for preliminary injunctive relief on April 2, 2025.

On April 3, 2025, Defendants filed a Motion for Sanctions (the "Motion for Sanctions") (ECF No. 82), along with a Brief in Support (ECF No. 83), asserting that Plaintiffs' counsel caused the filing of a fraudulent declaration and false allegations in violation of Federal Rule of Civil Procedure 11(b).  Defendants request that the Court strike or order that the Declaration of William Newman be withdrawn, that certain paragraphs of the Complaint be amended, withdrawn, or amended, and that Plaintiffs be directed to pay attorney's fees associated with the Motion for Sanctions.  Plaintiffs filed a Response (ECF No. 87) to that Motion on April 21, 2025.  On April 24, 2025, Plaintiffs filed a "Motion to Strike (ECF No. 88) Defendants' Evidence as to Edward C. Meier and Phyllis Meier's Alleged Joint Bank Accounts and Edward C. Meier's Alleged Non-

---

[5] Plaintiffs filed an Answer (ECF No. 77) to the Counterclaim on March 31, 2025.

Solicitation of Plaintiffs' Customers and Employees" ("Plaintiffs' Motion to Strike").    The Court will address the Motion for Sanctions and Plaintiffs' Motion to Strike below.

By way of factual background, Plaintiffs allege that Werner is one of the largest truckload and less-than-truckload carriers in the United States.  ECF No. 39 at ¶ 27.[6]  ECM Transport, LLC was created in 1988 to operate as a small six truck, twelve trailer Pennsylvania-based truckload carrier.  ECF Nos. 39 and ECF No. 71 at ¶ 30.  Edward Meier Sr. was the president and CEO of that ECM entity.  ECF No. 68 at ¶ 6.  At the same time, Edward Sr. created a holding company named ECO, through which he owned a large stake in ECM Transport, LLC.  *Id.* at ¶ 8.  Edward Sr. is the sole shareholder, board member, owner, and officer of ECO, and he operates every aspect of it.  *Id*. at ¶¶ 8-9.  Plaintiffs have asserted that ECO has never had any employees, does not have meetings, or adhere to other corporate formalities.  *Id.* at ¶ 12.

In 2021, after significant growth, ECM Transport, LLC became Plaintiff ECM.  ECF Nos. 39 and 71 at ¶ 35.  Plaintiff alleges that this transition was facilitated through a "Unit Purchase Agreement" that would allow for a business relationship to be formed between Werner and ECM. ECF No. 39 at ¶¶ 36-37.  Following this transaction, Edward Meier Sr. remained the President and CEO of ECM and became a minority member (20%) of ECM through ECO, with the other member (80%) being Werner.  ECF Nos. 39 and 71 at ¶¶ 38-39.  The purchase price paid by Werner for its 80% ownership interest was $142,359,000.00, Pl. Ex. 3 at ¶2.2, with Edward Meier, Sr. and ECO earning approximately $40 or $50 million through the transaction, Pl. Ex. 2 at 20:8-14.

---

[6] Where the Court cites only to the Complaint, i.e., only ECF No. 39, in describing the factual background of this case, Defendants have denied the allegation described by the Court.  Where the Court cites to both the Complaint and Answer, i.e., ECF Nos. 39 and 71, Defendants have admitted the portion of the allegation described by the Court.  The Court has also relied extensively on the affidavits and exhibits submitted by the parties and the testimony elicited at the PI hearing.  It bears noting that certain citations to the record submitted by the parties, and in particular by Plaintiffs, are not actually supported by the sections of the exhibits to which they cite, including video or audio exhibits that contain nothing of substance, at least in the form received by the Court.  Any assertion or argument not supported by an accurate citation to the record cannot be considered for purposes of consideration of the appropriateness of injunctive relief.

Contemporaneously therewith, Edward Sr. entered into an employment agreement (the "Employment Agreement") with ECM that included, inter alia, a 24-month non-compete provision, a 12-month non-solicitation provision, a provision allowing Plaintiffs to terminate Edward Sr.'s employment for cause,[7] a provision transferring Edward Sr.'s right, title, and interest in intellectual property to ECM or Werner, and provisions restricting Edward Sr.'s use or retention of ECM and Werner's confidential information.  ECF Nos. 39 and 71 at ¶¶ 41-50.[8]  Defendants Phyllis Meier, Edward C. Meier Jr., Courtney Meier, Alexis Meier, and Danielle Vardis, who were employed by ECM Transport at that time, remained employed at ECM following this acquisition. ECF Nos. 39 and 71 at ¶¶ 32, 51, 65.

Plaintiffs assert that Edward Meier Sr. served as "the brains of the operation" while acting as president of ECM during this timeframe, ECF No. 81 at 4, and Edward Sr. testified that he oversaw the entirety of the trucking business, including oversight of dispatch, pricing, bidding, and purchasing of equipment, ECF No. 72 at 41:23-43:2.  Phyllis Meier, whose role remained unchanged after the acquisition,[9] performed various administrative duties for ECM, including handling payroll, IT functions, maintaining employee files, approving invoices and resolving issues associated with invoices, paying bills, addressing utilities and expenses as necessary, and

---

[7] "Cause" is defined in the Employment Agreement to include, inter alia, the commission of any "act or omission that is or could be materially injurious to [ECM] or Werner or any of their respective affiliates and involves moral turpitude, dishonesty, embezzlement, misappropriation of[,] or fraud with respect to [ECM], Werner[,] or any affiliate of [ECM] or Werner" and a "breach of fiduciary duty, duty of loyalty[,] or gross negligence with respect to [ECM], Werner[,] or any affiliate of [ECM] or Werner."  Pl. Ex. 5 at ¶ 6(c).

[8] At the same time, ECM and Werner entered into a Management Agreement (ECF No. 54-3).  Defendants cite this Agreement for four propositions, *see* ECF No. 54 at ¶ 28, including accurately citing provisions that provide that ECM would remain solely responsible for hiring, disciplining, and terminating its employees and that Werner would be responsible for compensation of its employees, *see* ECF No. 54-3.  The other propositions that Defendants cite this Agreement for, specifically that no Werner employee was permitted to appear at ECM without an ECM request for the same and that ECM would continue to manage tractors and trailers and maintenance thereof, either require a strained reading of, or are not explicitly referenced in, the plain text of the document.  *Id*.

[9] The Court notes that Phyllis Meier was not paid for her work at ECM before the acquisition, and that she only began receiving compensation for her work following the acquisition.  ECF No. 72 at 92:14-24.

working with the billing department, Pl. Ex. 9 at 54:22-59:18; ECF No. 55 at ¶¶ 5-9, and also served in a support role for staff, with Alexis Meier describing her as the "office mom," Pl. Ex. 6 at 26:9-21.  Many ECM employees referred to Phyllis Meier's role as "Ed's secretary," ECF No. 72 at 93:23-94:2, and she worked two days per week in the office and, following Werner's acquisition of its interest in ECM, received an annual salary of $75,000.00, Pl. Ex. 9 at 59:19-22. In her role, Phyllis was not responsible for rates, pricing, routes, or dispatch, and she did not communicate with customers or brokers.  *Id.* at 55:18-56:2.

Alexis Meier was employed as a customer service representative during her time at ECM, and her work involved assisting her personal customers by entering and completing their shipments and providing them with tracking.  Pl. Ex. 6 at 41:6-42:2.  Alexis worked with and interacted with her customers frequently and maintained their contact information on her computer.  *Id.* at 43:1-16.

Courtney Meier began at ECM as a load finder customer service representative, but was later promoted to customer service manager before eventually being demoted to supervisor following the Werner acquisition.  Pl. Ex. 7 at 51:17-52:5.  She worked with and interacted with ECM's customers and brokers, and had knowledge of rate information, load information, customer name and contact information, and issues that customers had previously experienced while working with ECM.  *Id.* at 62:2-63:6.

Edward Meier Jr. started as a dispatcher with ECM in 2009 before moving to an office position in brokerage and load finding in 2013.  Pl. Ex. 9 at 54:10-14.  While that was his official position, he described himself as a "floater" and "jack-of-all-trades" with familiarity with, and capability in, all aspects of ECM's operations.  *Id.* at 54:13-22.  In his various roles at ECM, Edward Jr. oversaw drivers, worked directly with customers, and engaged in sales, pricing,

brokerage, and load finding. *Id.* at 54:13-57:8. He possessed contact information for ECM customers and brokers. *Id.* at 57:9-16.

During her time at ECM, Danielle Vardis was the day-to-day load finder for all extra available trucks that had not been booked by customers, and primarily worked with ECM's brokers. ECF No. 59 at 39:20-40:4. She was familiar with rates and pricing, had the authority to make pricing decisions, and had access to broker names and contact information. *Id.* at 43:16-45:19; 49:14-25.

On July 2, 2021, ECM, Werner, and ECO entered into a Third Amended and Restated Limited Liability Company Agreement ("Operative LLC Agreement"), which replaced the previously operative Second Amended and Restated Operating Agreement. ECF Nos. 39 and 71 at ¶¶ 53 and 54. Plaintiffs aver that the Operative LLC Agreement was intended to govern the respective rights and obligations of ECM, Werner, ECO, and the ECM Board of Directors. ECF No. 39 at ¶ 54. The Operative LLC Agreement provided that ECM would be managed, and all of its powers would be exercised, by or under the direction of the ECM Board, which included Edward Meier, Sr., subject to certain conditions, and four Werner members. Pl. Ex. 4 at ¶¶ 5.1 and 5.2. Under the Operative LLC Agreement, the ECM Board was, inter alia, granted the authority to "appoint and remove the officers, agents, and [ECM] employees"; "prescribe their duties, delegate authority to them[;] and fix their compensation"; "to file, prosecute, defend[,] or settle litigation proceedings"; and "to make all other arrangements that are necessary or convenient to the conduct, promotion, or attainment of the business purposes or activities of the entity." *Id.* at ¶ 5.5.

The Operative LLC Agreement also included non-compete, non-solicit, and non-disparagement provisions enforceable against Edward Sr. while ECO was a member of ECM, and

for three years after ECO ceased being a member.  ECF Nos. 39 and 71 at ¶¶ 55-58.  The non-competition section of the agreement provides:

> 14.2 Non-Competition. ECO and [Edward Meier Sr.] shall not, during the Restricted Period, directly or indirectly, in their own capacity or through any other Person, whether as owner, consultant, executive, partner, member, manager, officer, director, sales representative, venturer, agent, through equity ownership, investment of capital, lending of money or property, rendering of services, or otherwise, engage, prepare to engage, or assist others to engage, directly or indirectly, in the Business in the United States of America other than (a) as an employee of, or consultant to, Werner, the Company, or any Subsidiary or any of their respective Affiliates; or (b) owning shares of stock of any corporation having a class of equity securities actively traded on a national securities exchange or on the Nasdaq Stock Market which represent, in the aggregate, not more than one percent (1%) of such corporation's fully-diluted shares.

Pl. Ex. 4 at 53.  The Operative LLC Agreement further contained an arbitration agreement and a provision whereby ECM, ECO, and Werner agreed that injunctive relief would be appropriate in the event of an actual, intended, or likely breach of the restrictive covenants.  ECF Nos. 39 and 71 at ¶¶ 59.

Following Werner's acquisition of its interest in ECM, tension arose between the Meiers and Werner after Werner took over an account for an ECM customer, Corelle.  ECF No. 81 at 6-7; ECF No. 80 at 5-6.  Werner continued to engage in further activity that Defendants perceived as slights through 2022 and 2023.  *Id.*  Plaintiffs allege that, while the agreements between the parties allowed Edward Meier Sr. to continue to manage ECM as he had previously, it became clear by 2023 that Meier Sr.'s managerial performance was lacking.  ECF No. 39 at ¶¶ 60-61.  In light of the same, Werner sent its employees, Collin Porter, Brandon Workman, and Angelo Gibson, to assist with the management of ECM in 2023.  *Id.* at ¶ 62; ECF No. 11 at 14:16-15:1; ECF No. 13 at 24:24-25:11.  During this entire timeframe, Plaintiffs allege that a rift was formed between employees loyal to the Meiers (including the members of the Meier family and Danielle Vardis) and employees loyal to Werner, allegedly resulting in open hostility from "Meier loyalists"

9

toward Werner employees.  ECF No. 39 at ¶¶ 63-65.  The tension between the parties peaked when Angelo Gibson fired Shannon Meier, the non-party daughter of Edward Sr. and Phyllis, in 2024. ECF No. 81 at 7; ECF No. 80 at 7.  The parties' post-hearing briefing indicates that the parties generally agree that the atmosphere at ECM during this period was less than ideal, though each side attributes the blame to the other.  ECF No. 81 at 6-7; ECF No. 80 at 5-7.

In May 2024, Phyllis Meier began sending confidential ECM documents and information from her work email to a personal email address associated with ECO.  Pl. Ex. 9 at 94:5-101:5; ECF No. 81 at 9.  These documents included information regarding Werner's active unit inventory, a headcount report of ECM employees, a driver listing report, a spreadsheet containing customer service tickets, ECM order data, and the ECM handbook.  Pl. Ex. 9 at 94:5-101:5.  ECM discovered the existence of these emails in June of 2024.  Phyllis Meier was not terminated for this alleged conduct, and was instead permitted to stay at ECM in exchange for her signature on an agreement, dated June 27, 2024, that she would not use the information she had sent to herself for any purpose. ECF Nos. 39 and 71 at ¶¶ 70-71.  Phyllis further affirmed in the June 27, 2024 agreement that she had deleted any emails she had sent to herself, but she had not yet done so at that juncture.  Pl. Ex. 9 at 105:25-107:20.  She testified that she did not use these documents, or any other ECM documents, to assist in the eventual creation of her businesses, stating that she took the documents to protect Edward Sr.'s 20% interest in ECM and that the documents had no bearing on her new businesses.  ECF No. 72 at 99:8-101:14; 120:17-25.

On June 28, 2024, i.e., the day after Phyllis Meier signed her agreement with ECM, Defendant PC&A was registered as an LLC under Phyllis Meier, who used the address of a property owned by Alexis Meier to register PC&A.  ECF No. 72 at 106:22-107:1; Pl. Ex. 6 128:5-9.  On October 16, 2024, Defendants Black Horse and Corr were registered as LLCs.  Pl. Ex. 9 at

132:7-17; ECF Nos. 39 and 71 at ¶ 81. Defendant Interstate was registered as an LLC on October 30, 2024. *Id.* at ¶ 82.

Edward Meier Sr. was present when Phyllis Meier and Courtney Meier searched for office space to lease for PC&A at the Pittsburgh Mills Mall. ECF No. 72 at 58:24-62:1. Edward Sr. also looked at other businesses for Phyllis Meier to acquire. *Id.* at 68:13-69:14.[10] In an effort to expand PC&A's footprint, Phyllis Meier, from June to early fall of 2024, reached out to several trucking companies in an effort to potentially acquire the companies. Pl. Ex. 9 at 108:1-23. Phyllis used aliases involving her middle name "Marie" and her maiden name "Magoc" when contacting these companies, and she expressed a desire to be a "silent partner." *Id.* at 109:1-8.[11] Phyllis testified that she used these aliases to distance herself from the Meier name because of Edward Sr.'s reputation in the industry, the existence of his non-compete agreement, to avoid any appearance of impropriety, and to avoid comparisons to Edward Sr. *Id.* at 10:2-16:2. In attempting to acquire companies, Phyllis Meier represented that the buyer, i.e., her corporation, was "a family-owned business with a rich history and significant experience in the trucking industry." *Id.* at 133:10-19.

Phyllis Meier was terminated from ECM on September 6, 2024. Pl. Ex. 9 at 208:16-20. During the night of September 7, 2024, Edward Sr. and Phyllis removed[12] thirteen boxes of documents, including documents that belonged to ECM, from Phyllis's former office. *Id.* at 207:9-

[10] Meier Sr. was evasive during this line of questioning during the PI Hearing, but he admitted to looking at businesses and did not deny that he looked at businesses for Phyllis Meier when asked the question directly.

[11] Alexis Meier testified that she believed that her mother was using aliases in an effort to keep the possible acquisitions quiet and because Phyllis "couldn't have the Meier name associated with what she was doing[.]" Pl. Ex. 6 at 121:16-122:2.

[12] While Plaintiffs characterize this removal as "stealing" or "theft," none of the Defendants were criminally prosecuted for the actions at issue in this case. Edward Meier Sr. testified that they removed the documents because Angelo Gibson had instructed Phyllis to clean out her office by the 7th or the 8th of September. ECF No. 72 at 48:1-11.

217:16.  ECM terminated Edward Sr. following this event.  ECF No. 80 at 12.  Edward Sr. and Phyllis returned four boxes of documents that belonged to ECM in October of 2024, with the nine others not containing ECM documents.  *Id.* at 213:14-214:5; ECF No. 54 at ¶ 82.  Each has stated in their respective affidavits that they did not make copies of the documents and did not utilize them.  ECF No. 54 at ¶¶ 84-85; ECF No. 55 at ¶¶ 21-22.  Following his termination, Edward Sr. and ECO filed a lawsuit against Plaintiffs in state court[13] alleging breach of contract, breach of fiduciary duty, and slander, through which they are seeking, presumably through discovery, Plaintiffs' corporate records, including financial information.  ECF Nos. 39 and 71 and ¶¶ 83-87.

Following Phyllis Meier's termination from ECM, she communicated with Edward Meier Jr., who at the time was still employed by ECM, requesting that he provide her with information.  Pl. Ex. 8 at 121-24; Pl. Ex. 84, 85, 91, 92.  Phyllis further asked that Edward Jr. call her from somewhere outside the office, and instructed him to use his cellphone, and not his office phone, when he called.  *Id*.  On one occasion, Edward Jr., while still employed with ECM, coordinated with Phyllis and Danielle Vardis to attempt to create a business relationship for "spot services" between Phyllis and an ECM customer, though no business relationship was formed because the customer would not speak to Edward Jr.  Pl. Ex. 8 at 118:22-119:21; *id.* at 49:22-52:5.

Also following the termination of Phyllis Meier's employment with ECM, Courtney Meier sent screenshots to Phyllis Meier showing ECM rates, brokers, and customers.  Pl. Ex. 7 at 101:19-114:16; Pl. Ex. 93, 94.  While still employed at ECM, Courtney Meier informed Phyllis Meier, who was no longer working for ECM and who had formed PC&A at that point, that an ECM customer was unhappy that ECM could not provide them with trailers.  Pl. Ex. 9 at 150:8-165:2  Phyllis then contacted that customer to inform the customer that she was aware ECM could not

---

[13] That case has been removed to this District.

provide the trailers and that Phyllis's new business could provide those trailers. *Id*. In speaking to a representative of the customer, Phyllis referred to herself as "Marie Magoc" in an effort to avoid association with her husband, and she billed the customer under PC&A after an agreement was reached. *Id.* at 166:17-167:16. Plaintiffs' counsel's line of questioning during Phyllis Meier's deposition makes clear that Plaintiffs contend that Phyllis Meier was masquerading as an ECM employee during the call with this customer. *Id.* at 172:18-174:1. After Courtney was terminated, she contacted two brokers who contracted with ECM after those two brokers had reached out to her. Pl. Ex. 7 at 208:19-209:17.

ECM terminated Defendant Danielle Vardis and the Meier Children Defendants in late 2024. ECF Nos. 39 and 71 at ¶ 66; ¶ 89. Because of annoyance she experienced following her termination, Danielle Vardis suggested to one employee of an ECM customer that she (Danielle) would recommend that the employee "avoid as much as [the employee could] booking freight with [ECM]." Pl. Ex. 59 at 98:8-16. After her termination, Danielle Vardis also worked with Phyllis Meier to set up certain of Phyllis's companies, *id.* at 34:1-37:12, including their physical spaces, phones, and internet, and attempted to solicit business for Phyllis Meier's new ventures from an ECM customer, *id.* at 90:19-92:9.

Phyllis Meier, while still employed at ECM, looked into buying two ECM trucks from a salesperson for a business called M & K, which acted as an intermediate purchaser, i.e., Phyllis did not directly negotiate to buy the trucks from the original seller. Pl. Ex. 9 at 218:1-223:5. She did not purchase the trucks, primarily because they were not single-axle vehicles. *Id*. She did, however, after leaving ECM, direct the M & K representative to look at other locations for trailers, and eventually purchased four or fourteen[14] former ECM trailers from M & K. *Id.* at 223.6-

---

[14] Phyllis originally testified, and counsel asked questions, related to the purchase of fourteen ECM trailers. Pl. Ex. 9 at 223:18-21. However, the following line of questioning causes some confusion on the actual number:

225:21. Phyllis Meier had previously purchased either twelve or twenty-two non-ECM trailers from M & K that had been acquired in Michigan. *Id.* at 225:23-226:2. Phyllis now possesses twelve tractors and twenty-six trailers. *Id.* at 230:7-13. In her affidavit, she stated that it was not her intention to create competing companies, because she intended to utilize only single-axle tractors for "less than truck load" ("LTL") freight, whereas ECM utilizes tandem-axle tractors that are capable of hauling greater weights,[15] and further because she did not want to harm ECM because Edward Sr. still owned a 20% interest in the company. ECF No. 55 at ¶¶ 56-61.

In December 2024, Phyllis Meier, using the name Marie Magoc and operating through Black Horse, pursued an opportunity to purchase a Michigan-based business called JK Transport, Inc. that operates approximately twenty trucks in the Detroit area, signing a letter of intent and utilizing a non-disclosure agreement in negotiating with JK Transport. Pl. Ex. 9 at 11:5-12:16; *id.* at 69:2-7; *id.* at 125:1-126:6. According to the letter of intent, Black Horse, which purported to be a family-owned business with a rich and significant history in the trucking industry, intended to purchase all of the issued and outstanding shares of common stock in JK Transport for a purchase price of $2.6 million. *Id.* at 132:7-136:17. The letter of intent described JK Transport as "a trusted provider of on-time same day / next day LTL and TL services across various end markets." ECF

---

Q You now have 12 tractors and 26 trailers, right?
A Right.
Q Four of those came from ECM?
A I believe that is the math, yes.
Q Is that the complete list of tractors and trailers you own?
A Yes.

Pl. Ex. 9 at 230:7-13.

[15] *See* Pl. Ex. 11 (Werner employee Collin Porter testifying that ECM does not, to his knowledge, provide less than truckload carrying).

No. 132 at 1.  Phyllis did not purchase JK Transport, citing the initiation of this litigation as the basis for her decision not to move forward.  *Id*. at 125:1-126:6.

Plaintiffs argue that Defendants possess all the necessary resources to compete against Plaintiffs, including "Plaintiffs' competitive information, bidding data, customer names and contacts, strategies, practices, and other trade secret information." *See* ECF No. 81 at 15.  Plaintiffs aver that Edward Sr., who testified to having more than $100 million in net worth, Pl. Ex. 2 at 23:2-13, is using the other Defendants to avoid his restrictive covenants via the creation of the LLC Defendants, with Phyllis Meier listed as the owner or officer, to compete with Plaintiffs while utilizing Plaintiffs' trade secrets and confidential information.  ECF No. 39 at ¶ 101; ECF No. 81 at 1.  In support of this accusation, Plaintiffs' post-hearing briefing cites to several text messages and deposition transcripts in the record.  *See* ECF No. 81 at 15.  While the Court will reference that evidence here, it notes that several of the text messages are single messages that were later clarified or explained in some fashion during depositions.  The Court will note the same where appropriate.

On August 9, 2024, Danielle Vardis sent a text message to her brother stating "[ECM] is a horrible horrible place and [I] need out asap.  Ed was gunna open a new company and take me but haven't heard anything since." Pl. Ex. 58.  On October 2, 2024, Danielle Vardis sent a text message to an individual who worked for a brokerage company, *see* Pl. Ex. 59 at 90:4-25, stating that she and "the wife of [the ECM] owner," i.e., Phyllis Meier, intended to open a new trucking company. Pl. Ex. 57.  She explained:

> So it'll be a couple months but we will be working together again first of year.  Its asset [sic] same concept as [ECM].  Same owners so it'll be a company you can trust. . . .  Due to [W]erner buying [ECM] it has nothing to[] do with [ECM] and nothing can be eaid [sic] for now as her kids and my [employees] that [I] love still work at [ECM] for [W]erner.  It's hell for them every []day.  Everyone[']s jobs are

on the line. So since we have no position for them until they get fired and until the new company is up and running this is[] [extremely] confidential.  But exciting.

*Id*.  She later testified that Edward Meier Sr. had no involvement in the creation of any of the new companies, but acknowledged in that testimony that, if she were referring to the owner of ECM, that would insinuate that she meant Edward Sr.  Pl. Ex. 59 at 87:25-89:14.

On September 25, 2024, Alexis Meier sent a text message to Danielle Vardis stating "[b]asically yea same shit different name used but ok that's no problem there and understandable." Pl. Ex. 60.  During her deposition, Alexis testified that what she meant by this statement was that PC&A, which has a different name from ECM, would provide transportation services, i.e., the same services ECM provides to the same general customer pool that ECM serves.  Pl. Ex. 6 at 138:25-145:4.  Alexis Meier testified that she said "no problem there" and "understandable" in the text message to indicate that she had no objection to keeping the discussions confidential because she was still an ECM employee at that time.  *Id.* at 145:5-13.

On October 23, 2024, Shannon Meier sent a text message to Courtney Meier stating "[t]hey don't get the business is dad."  Pl. Ex. 10.  Plaintiffs incorrectly attribute this statement to Courtney Meier and suggest that the message supports their assertion that Edward Meier Sr. was the mastermind behind the creation of Phyllis's Meier's new trucking companies.  *See* ECF No. 81 at 16.  As noted, the message was sent by non-party Shannon Meier *to* Courtney Meier, and Courtney testified that the message was in reference to Werner's failure to appreciate Edward's Sr.'s importance at *ECM*, not one of Phyllis's new companies.  Pl. Ex. 7 at 76:21-78:18.  While it seems that Plaintiffs' counsel's line of questioning was meant to elicit testimony about Edward Sr.'s experience and knowledge in the trucking industry, particularly when compared to Phyllis's expertise, *see id.* at 78:8-79:24, the location of Plaintiffs' incorrect citation to this text message appears to suggest that Plaintiffs intend to suggest that the text message referred to Edward Meier

16

Sr.'s role in one of Phyllis's new companies. Such an assertion is contradicted by the evidence of record.

In starting her businesses, Phyllis Meier used funds from a bank account to which she had access that was in Edward Sr.'s name, and both Edward and Phyllis characterize the funds in that account as "marital assets," with Edward contributing the majority of the cash value to the accounts. Pl. Ex. 2 at 43:5-45:12; Pl. Ex. 9 at 27:9-14, 30:6-9; 185:4-14; 188:4-9. Edward Sr. and Phyllis entered into an antenuptial agreement in 1988 that, inter alia, established the parties' assets at the time and that further contained provisions as to who would possess certain funds and the appreciation of the same in the event of a termination of the marriage, with each individual bearing the same as "separate property" during the marriage Pl. Ex. 113. That document gives each party "the absolute and unrestricted" right to control those funds. *Id*. Both Edward Sr. and Phyllis have testified that the PNC accounts used by Phyllis in starting her new businesses contained only marital assets, that they never intended such funds to be subject to their antenuptial agreement, and that they have been very intentional in keeping marital assets separate from any funds subject to the antenuptial agreement. *See* ECF No. 72 at 75:1-78:13; 121:1-4; Pl. Ex. 9 16:1-17-13; 139:10-144:18. Phyllis Meier ordered her laptops from her personal email address, which displayed as an "ECO Industries Inc." email address. Pl. Ex. Nos. 111; 112. Edward Meier Sr. testified, rather evasively, during the PI Hearing that he has had some level of participation in inspecting trucks, businesses to acquire, and auctions that Phyllis Meier might be interested in for her businesses. *See* ECF No. 72 at 62:2-68-16.

17

## II.    Discussion

### A.  Motions to Strike and Motion for Sanctions

As each side's Motion to Strike and Defendants' Motion for Sanctions involve threshold issues related to evidence introduced during the PI Hearing, the Court will first resolve the issues raised in those Motions before addressing the PI Motion.

### 1.  Defendants' Motion to Strike

As noted, Defendants move to strike Plaintiffs' Errata Affidavit, as well as Paragraphs 3, 5 through 20, and 24 of the Affidavit of Nathan Meisgeier.  With respect to the Errata Affidavit, Defendants take issue with the fact that the document, like Plaintiff's original filing of the document at ECF No. 52, is unsigned and unsworn.  ECF No. 70 at ¶ 10.  Defendants argue that the Errata Affidavit is neither an affidavit nor a declaration, that it does not constitute testimony, that it contains legal argument as opposed to strictly fact, and that its citation to exhibits is belated as it occurred after the close of evidence.  *Id.* at ¶¶ 13; 15; 21.  For those reasons, Defendants argue that the Errata Affidavit should be disregarded during the Court's consideration of the PI Motion and struck from the record.  *Id.* at ¶¶ 18-20.  With respect to the Meisgeier Affidavit, Defendants assert that certain Paragraphs should be stricken for the following reasons: (1) Paragraph 3, because it attempts to incorporate the faulty Errata Affidavit, because Meisgeier does not claim to have personal knowledge of all topics in the Errata Affidavit, and because the Errata Affidavit goes beyond the scope of his deposition and the topics counsel permitted Meisgeier to testify regarding; (2) Paragraphs 5-20, again on the basis that the subject matter of these paragraphs is beyond the scope of Meisgeier's deposition; and (3) Paragraph 24 because it is inadmissible hearsay.  *Id.* at ¶¶ 23-26.

Plaintiffs spend much of their Response in Opposition arguing the merits of the PI Motion as opposed to Defendants' Motion to Strike,[16] but generally argue that Defendants' challenge to the Errata Affidavit and the Meisgeier Affidavit puts form over substance, and that the assertions therein are supported by evidence of record, with citations thereto.  ECF No. 73 at 2.  Plaintiffs further argue that the Rules of Evidence do not apply to preliminary injunction proceedings, and that both hearsay and affidavits made without personal knowledge may be considered by a court in the context of deciding whether to issue a preliminary injunction.  *Id.* at 7-11.

Plaintiffs are correct.  The procedures that accompany the potential issuance of a preliminary injunction are less formal, and the evidence at issue is less complete, than a trial on the merits.  *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004).  Evidence that would be inadmissible at trial, including hearsay, may be considered in this context, and the formal strictures that apply to an affidavit in support of a Rule 56 motion, including the requirement that the affidavit be made on personal knowledge, do not apply to affidavits in support of a preliminary injunction.[17]  *Id.*; *see also Star Creations Inv. Co. v. Alan Amron Dev., Inc.*, No. CIV. A. 95-4328, 1995 WL 495126, at *10 (E.D. Pa. Aug. 18, 1995) ("For example, it is well-established that on a motion for preliminary injunction a court may receive and rely upon affidavits that do not meet

---

[16] It also sometimes contains, like much of Plaintiffs' briefing, hyperbolic statements that are not particularly helpful to the Court's consideration of the issues at hand.  Defendants, to an equal degree, are also prone to hyperbole.  The Court notes that the inclusion of hyperbolic and, in particular, ad hominem statements are neither an effective nor productive use of counsel's time, as the same have no impact on the Court's resolution of the issues at hand, which involves consideration of only proper legal argument, the law, and the evidence of record.  Further, the Court notes that the record at this time is replete with examples of, politely stated, overly argumentative and uncourteous discussions between counsel.  This is true of both sides to an equal degree.  The same serves no benefit and only muddles a record that is already quite voluminous at this juncture.  While the Court would never discourage zealous advocacy, the Court expects, moving forward, that the parties will attempt to focus on the facts and legal issues involved in this case, and attempt to set aside some of the unnecessarily argumentative statements that each side has utilized to date.

[17] This is notable because Defendants cited to Rule 56's strict affidavit standards in moving to strike the Errata Affidavit.

19

the requirements of affidavits under Fed. R. Civ. P. 56(e), i.e., they need not be made on personal knowledge or set forth facts that the affiant would be competent to testify to at trial."). "District courts must exercise their discretion in 'weighing all the attendant factors, including the need for expedition,' to assess whether, and to what extent, affidavits or other hearsay materials are 'appropriate given the character and objectives of the injunctive proceeding.'" *Kos Pharms.*, 369 F.3d at 719 (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

The Court agrees with Plaintiff as to the Errata Affidavit and the Meisgeier Affidavit. The Court will not deny a preliminary injunction request on mere technicalities such as the failure to include a signature.[18] This Court is capable of confirming whether the statements in the Errata Affidavit are consistent with the evidence of record, which is substantial and which includes sworn deposition testimony. If they are not, or if they consist merely of legal argument, such statements will be entitled to lesser or no weight. If they are consistent with the admitted evidence, they will be considered and weighed by the Court in resolving the PI Motion. As to the Meisgeier Affidavit, Defendants' technical objections as to its reliance on hearsay and Meisgeier's lack of personal knowledge in support of all averments in the Errata Affidavit are meritless consistent with the binding precedent set forth in *Kos*. The fact that certain statements may have exceeded the scope of Meisgeier's deposition goes to the issue of weight, not whether the document itself or paragraphs therein should be stricken. As noted, the record is substantial in this case, and the Court has the discretion to, and can, assess what weight, if any, to assign to any portion of the parties' submissions. For these reasons, Defendants' Motion to Strike will be denied.

---

[18] Plaintiffs correctly note that the Meisgeier Affidavit, which incorporated the Errata Affidavit, is signed by Meisgeier, thus defeating this technicality argument raised by Defendants. Even if it did not, the Court would permit Plaintiffs to file an amended, signed, affidavit.

### 2.  Plaintiffs' Motion to Strike

By way of their Motion to Strike, Plaintiffs seek to strike the following evidence: (1) all evidence that Edward Meier Sr. and Phyllis Meier hold Edward C. Meier's PNC Bank Account jointly; and (2) all evidence that Edward Meier Sr. did not solicit Plaintiffs' customers and employees.  ECF No. 88-1.  Plaintiffs further seek a spoliation sanction in the form of an adverse inference that, due to the destruction of his phone records during the relevant time period, Edward Meier Sr. did, in fact, solicit Plaintiffs' customers and employees during the period covered by his destroyed phone records.  *Id.*  The Court's discussion above applies equally to Plaintiffs' Motion to Strike.  Plaintiffs' Motion to Strike can better be described as a brief in further support of their PI Motion, and the argument respecting the joint nature of bank accounts is addressed in their substantive post-hearing brief.

It bears noting that the record before the Court is not the final trial record in this case,[19] but rather an incomplete record developed for purposes of determining whether preliminary injunctive relief should be issued.  Again, the Rules of Evidence do not apply.  To the extent that Defendants' evidence is contradicted by other evidence of record, the Court will take the same into account in considering what amount of weight, if any, the evidence should be afforded at this juncture.  The Court will certainly, as it will with Defendants' Motion to Strike, keep in mind any arguments raised by Plaintiffs' Motion to Strike respecting the reliability of any evidence introduced.  To the extent that the Court agrees that spoliation of certain evidence might eventually be established on a complete record, the Court will again keep that in mind in weighing evidence.  The Court will not, however, strike any evidence or award sanctions at this juncture and on this record.  In this

---

[19] While the Court acknowledges that likelihood of success on the merits is one of the requirements for the issuance of a preliminary injunction, the Court believes that each party, at points, forgets that the evidence of record is not a final, complete reflection of all evidence that might eventually be shared and introduced, with each veering toward argument that might be more appropriately raised in seeking summary judgment.

Court's estimation, the Motions to Strike appear to constitute clever gamesmanship as opposed to sincere requests for relief. Plaintiffs' Motion for Sanctions will be denied.

### 3. Defendants' Motion for Sanctions

Defendants' Motion for Sanctions seeks the following relief: (1) an order directing Plaintiffs to withdraw William Newman's Declaration; (2) an order directing Plaintiffs to withdraw or amend Paragraphs 100, 103, 130, 138, 147, 154, 165, 169, 194, 199, 201, and 202 of the Complaint; and (3) an order directing Plaintiffs to pay Defendants' counsel reasonable attorneys' fees for the preparation and filing of the Motion for Sanctions. ECF No. 82-1. Defendants assert that the Declaration (ECF No. 1-4) attached to Plaintiffs' original complaint was fraudulent based on certain testimony elicited during Newman's deposition, and that the Newman Declaration and any allegation related to Newman's purportedly fraudulent Declaration should be stricken based upon Plaintiffs' or Plaintiffs' counsels' violation of Rule 11. ECF No. 82 at ¶ 18.

Defendants' Motion for Sanctions is meritless, as there is certainly not sufficient evidence of a Rule 11 violation on either Plaintiffs' or counsels' part. This Court will consider Newman's recantation of his Declaration in weighing the evidence at this stage. That said, the Court will also consider the fact that he was terminated for inappropriate text messages with a coworker (Defendant Vardis) and text messages respecting the lawsuit at hand, all prior to recanting his Declaration, in weighing his credibility. Again, Defendants appear to be engaging in gamesmanship, and their Motion for Sanctions will be denied.

### B. Motion for Preliminary Injunction

In moving for injunctive relief, and as noted, Plaintiffs aver that Edward Sr. is using the other Defendants to avoid his restrictive covenants and to compete with Plaintiffs while utilizing Plaintiffs' trade secrets and confidential information. ECF No. 39 at ¶ 101; ECF No. 81 at 1.

Plaintiffs allege that there "is no doubt that Meier Sr. runs the Meier Family Empire though he acts through Phyllis Meier, the Meier Children, and Alexis Meier's best friend and disgruntled former ECM employee Danielle Vardis." ECF No. 81 at 1. Plaintiffs aver that the Meier family, Vardis, and ECO are acting swiftly to impose irreparable injury on ECM and Werner, specifically the misappropriation of Plaintiffs' confidential information and trade secrets to damage Plaintiffs' competitive advantage and disrupt its customer relationships, thus necessitating preliminary injunctive relief. ECF No. 5 at 13.

In light of the Court's rulings above, all evidence introduced to date will be considered in resolving the PI Motion. With respect to the standard for the issuance of a preliminary injunction, the United States Court of Appeals for the Third Circuit has explained:

> To obtain an injunction, the plaintiffs had to demonstrate (1) that they are reasonably likely to prevail eventually in the litigation and (2) that they are likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest.

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (quoting *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)). "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos Pharms.*, 369 F.3d at 708 (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)). "[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Kos Pharms.*, 369 F.3d at 708 (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)). The court may issue a preliminary injunction only on notice to the adverse party. Fed. R. Civ. P. 65(a)(1).

Initially, the Court notes that, with respect to Edward Meier Sr. and ECO, Plaintiffs ask the Court to issue preliminary injunctive relief prohibiting him from violating restrictive covenants in the relevant contracts at issue.  Defendants do not argue that these covenants do not exist, though they do argue that the same are unenforceable.[20]  That said, Edward Sr.'s own (often evasive) testimony during the preliminary injunction hearing in this matter calls into question his level of interest and participation in the new companies, including inspecting trucks, businesses to acquire, and auctions.  *See* ECF No. 72 at 62:2-68-16.  Given Edward Sr.'s stated desire to not compete with Plaintiffs, these actions seem, at least, somewhat reckless.  To avoid all doubt, the Court hereby directs that Edward Meier Sr. and ECO, in the absence of a finding that the restrictive covenants at issue are unenforceable, continue to abide by the contracts at issue in this case.  The Court will not, however, issue relief with respect to the remaining Defendants.

As to the first factor required for preliminary injunctive relief to issue, likelihood of success on the merits, "a sufficient degree of success for a strong showing exists if there is a reasonable chance or probability[ ] of winning." *Xie v. GUANHE Home essentials*, No. 2:25-cv-00265, 2025 WL 1039233, at *2 (W.D. Pa. Apr. 8, 2025) (quoting *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 256 (3d Cir. 2020)).  Plaintiffs have not met that burden on this factor, and their request for preliminary relief will therefore be denied on that basis.

With respect to Plaintiffs' allegations of a conspiracy headed by Edward Meier Sr., Plaintiffs have not introduced sufficient evidence to support a preliminary injunction against the other Meiers and the business defendants.  The evidence at this stage indicates that Edward Meier Sr. was the creator of ECM and that he is a successful figure in the trucking industry within this District.  That said, all of the other individual Defendants also worked for ECM for periods of

---

[20] That issue is one for another day, as the Court can resolve the present motions at issue without addressing this dispositive issue that is better addressed at the summary judgment stage of the proceedings.

years.  While the Court understands Plaintiffs' argument that Edward Meier Sr. might have the resume to support their belief that he *could* successfully start a new trucking business, that does not, necessarily, mean that the rest of his family and longtime employee Danielle Vardis, who have lived and/or worked with Edward Sr. for years and none of whom are subject to restrictive covenants, could not also prove successful in starting their own business without Edward Sr.'s involvement.  Plaintiffs' arguments at this point amount to mere speculation[21] that Edward Meier Sr. is the mastermind behind the creation and day-to-day operations of the businesses at issue. That is not sufficient at this stage to issue preliminary injunctive relief while this case is pending.

Further, Plaintiffs cite to inapposite, out-of-circuit, state court case law for the proposition that Phyllis Meier's access to a bank account in her husband's name somehow proves that Edward Sr. funded Phyllis's new businesses for purposes of competing with ECM, a company he maintains a significant interest in.[22]  It bears noting that Edward Sr. provided Phyllis access to the accounts at issue well before Werner's acquisition of its interest in ECM.  *See* ECF No. 72 at 75:1-78:13; 121:1-4; Pl. Ex. 9 16:1-17-13; 139:10-144:18.  The Court finds Plaintiffs' line of reasoning to be insufficiently supported at this juncture, and will not award injunctive relief based solely upon the fact that a husband and wife share access to a bank account.

---

[21] And, at times, dismissive and reductive rhetoric about the other members of the Meier family.

[22] *See Evergreen Crane Servs., Inc. v. Ford*, 144 Wash. App. 1015 (2008) ("Because the covenant expressly prohibited *engaging* in the operated crane business as a creditor and because Ford's conduct *went beyond that of mere financial assistance*, we affirm.") (emphasis added); *see also Norlund v. Faust*, 675 N.E.2d 1142, 1158 (Ind. Ct. App.), *decision clarified on denial of reh'g*, 678 N.E.2d 421 (Ind. Ct. App. 1997) ("This decision should also not be interpreted to *indicate that a spouse cannot conduct an independent business*. In fact, the *Russell* case clearly shows that *if there is no evidence that the covenantor is acting with or through the spouse then no injunction shall be issued*." (emphasis added)).

Plaintiffs' argument in support of their assertion that the Defendants are improperly utilizing confidential information in pursuing their business ventures is also lacking at this time.[23] Every Defendant in this case except for Edward Sr. and ECO is now permitted to compete with Plaintiffs, so long as they do not improperly utilize protected information in doing so. Plaintiffs have not introduced sufficient evidence at this juncture to establish how any of the Defendants actually utilized trade secrets in any manner, let alone how Plaintiffs have been or will be irreparably harmed in the absence of injunctive relief at this time.[24] This appears to be a case where damages will compensate for any potentially proven harm. While Plaintiffs go to great lengths to establish that Plaintiffs themselves believe that they possess confidential information, they have not met their burden of establishing that anyone has actually misappropriated that information.[25] Only Edward Meier Sr. and ECO are subject to restrictive covenants,[26] and while the other Defendants are prohibited by law from misappropriating confidential information, Plaintiffs bear the burden of showing such misappropriation. They have not established entitlement to injunctive relief as to the remaining Defendants at this juncture.

The Court does acknowledge that the use of an alias by Phyllis Meier could raise suspicion of nefarious activities. That said, her use of an alias could just as easily support a finding that she is, in fact, branching out on her own and avoiding any involvement of an individual who is subject to restrictive covenants. Edward Sr.'s and Phyllis's nighttime removal of documents from ECM

---

[23] The Court notes that this finding also undermines Plaintiffs' state law claims, as those claims rely on assertions of misappropriation of trade secrets.

[24] Angelo Gibson testified that ECM has not lost a customer as a result of Defendants' alleged actions. ECF No. 72 at 137:14-143:1. The Court acknowledges, however, that the potential of irreparable harm is sufficient for an award of injunctive relief.

[25] The Court notes that Defendants argue stridently that the information Plaintiffs seek to protect does not contain trade secrets, but a finding on that dispositive issue is not necessary given the Court's holdings herein.

[26] Outside of the one-page and largely unnecessary (because the law protects confidential information) "Declaration of Non-Use of Proprietary Information" (Pl. Ex. 35) entered into by Phyllis Meier with Werner.

26

after Phyllis's termination is likewise not as dispositive as Plaintiffs would insinuate, as: (1) Edward Sr. and Phyllis worked at ECM for years and testified to their awareness of the presence of cameras that would film the removal; (2) Phyllis had been instructed to clean out her office by a certain date; and (3) not all documents that were removed belonged to ECM.  All of the above issues will ultimately be for the factfinder to resolve, but, again, the Court believes this record is insufficient to establish a likelihood of success on the merits.

Finally, as to any assertion of unclean hands and/or abuse of process, the Court finds the record underdeveloped at this stage.  Following Plaintiffs' removal of the state court action initiated by Edward Meier Sr. and ECO, this Court now presides over that case, as well as a separate action filed by Phyllis, Edward Jr., Alexis, and Courtney.  As such, the Court will not issue injunctive relief based upon alleged abuse of process or find that Plaintiffs have unclean hands at this juncture, and intends to address pending motions in the newer cases contemporaneously.  It further notes that Plaintiffs will have ample opportunity to oppose any discovery requests in those cases following the commencement of discovery.

The Court's duty at this stage is not to determine to a certainty what has taken place, but is rather to determine whether the evidence at this stage supports an award of injunctive relief pending the adjudication of this matter.  In this Court's estimation, Plaintiffs have fallen short of their burden.  For the reasons discussed above, Plaintiffs have not established a likelihood of success on the merits, and their Motion seeking preliminary injunctive relief will be denied.  The Court need not address the remaining factors given Plaintiffs' failure to meet a threshold requirement.  It goes without saying, however, that Plaintiffs fail on each of the remaining factors given the Court's finding on the likelihood of success factor.

### III.    Conclusion

For the reasons discussed above, the Court will deny each of the Motions at issue in this Memorandum Opinion.  An appropriate Order of Court follows.

BY THE COURT:


*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: March 13, 2026

cc: All counsel of record